Filed 6/27/25  P. v. Richardson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C101579 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 62196255, 62193890) |
| v. | |
| REGAN JEFFREY RICHARDSON, | |
| Defendant and Appellant. | |

Defendant pled no contest to battery against his spouse in a misdemeanor case and inflicting corporal injury on his spouse in a felony case.  Defendant's conduct giving rise to the felony case occurred four months after he committed the misdemeanor battery.  On appeal, defendant argues the trial court erred by denying his motion for mental health diversion under Penal Code section 1001.36 in the felony case by finding there was an unreasonable risk he would commit a super strike offense.[1]  We shall affirm.

---

[1] Further undesignated statutory references are to the Penal Code.

1

# I. BACKGROUND

In September 2023, a complaint charged defendant with misdemeanor false imprisonment and battery (the misdemeanor case). (§§ 236, 243, subd. (e)(1).) In January 2024, an information alleged defendant committed assault by means of force likely to produce great bodily injury, corporal injury on his spouse, and endangering the health of a child (the felony case). (§§ 245, subd. (a)(4), 273.5, subd. (a), 273a, subd. (b).)[2]

## A.    Background

Defendant and C.R. have been married for 16 years. They have three children between the ages of eight and 16. During their 16-year marriage, C.R. had never had any concerns about defendant's mental health. Further, there had never been other periods when defendant thought she was cheating on him or told her he was hearing voices or being paranoid.

## B.    Misdemeanor Case

Prior to the misdemeanor incident, defendant was experiencing paranoia and accused C.R. of seeing other men. C.R. thought this came from "out of the blue" as they both worked from home.

On September 9, 2023, defendant texted C.R. that when she woke up, he would have "all the evidence" of her infidelity. When C.R. woke up, the two got into an argument, which became physical when she pushed him. Defendant jumped in the shower, which angered C.R., so she hit him when he got out. Defendant left the house for a few minutes, then came back and took his wife's keys from the purse she was holding and left. Three hours later, the police showed up at the house.

---

[2] After the preliminary hearing, the trial court declined to certify the charge that defendant violated a domestic violence court order.

C.R. agreed with the responding police officer that defendant "pinned" her in this altercation, but at the hearing on the diversion motion she asserted she did not know what that word meant when she spoke to the officer. She further testified, "He—he grabbed—he didn't grab me. He actually grabbed, like, to get the keys out of my purse."

Dr. Marine Jakubowski, a psychologist, evaluated defendant in October 2023. Defendant told Dr. Jakubowski he believed C.R. had a "lover" with a large support network and he suspected his wife was attempting to have him murdered. Defendant told the psychologist he and C.R. had been arguing the night before because he thought she had been unfaithful. The two agreed to discuss the matter in the morning, but when he woke up he decided he did not want to have that conversation. He packed an overnight bag, and when he was leaving C.R. awoke and became angry. C.R. engaged him by yelling, pushing, screaming, and blocking his exit from the house. He left, but while he was driving he realized C.R. may have taken one of his bags that had a firearm in it, so he returned home. He told Dr. Jakubowski he did not falsely imprison his wife, but he admitted he took her keys and her purse and searched through it for his firearm.

In her evaluation, Dr. Jakubowski diagnosed defendant with paranoid personality disorder, attention deficit/hyperactivity disorder, major depressive disorder, and cannabis use disorder. She concluded the assault occurred during an episodic psychotic phase with paranoia and anxiety, where the mental disorder played a significant role in the commission of the offense. She believed defendant's symptoms would respond positively to mental health treatment. She stated defendant was in the low range for risk of reoffending due to his score on a structured risk assessment guide called the Historical Clinical Risk Scheme.

On November 30, 2023, the People and defendant stipulated to mental health diversion. Defendant attended the initial intake session for his mental health treatment on January 8, 2024, and his first appointment was scheduled for January 15, 2024.

3

*C.      The Felony Case*

On January 11, 2024, defendant asked his wife to take him to the hospital. Defendant appeared confused and lost, and he "couldn't really tell what was going on." He then said, "Okay, I'll just go." C.R. testified that during the month of January, defendant was listening to voices and suddenly "getting lost."

On January 12, 2024, defendant told C.R. he had a video of her saying that she was planning with others to kill him. At about 2:00 a.m., defendant woke his wife up and again told her he needed to go to the hospital. C.R. knew something was going on because defendant "was lost and going up and down the steps, turning on the lights, turning them off, [and] talking to himself." After some back and forth, C.R. told defendant she could call an ambulance. Defendant responded, "I'll be back" and left.

Defendant returned and tried unsuccessfully to get in the front door. His wife tried to help him by opening the front door, but defendant had already gone to another door before she could. When she went to the other door, defendant returned to the front door.

Eventually, C.R. was able to let defendant in. C.R. said, "[O]h my God, here you are." Defendant responded, "[T]hank you, baby, thank you, it's just been a crazy night." Meanwhile, the children were asleep in the home.

Defendant took his shoes off and C.R. told him to get in the shower. At that time and with no provocation, defendant grabbed C.R. by the neck with both hands and pushed her against the wall. C.R. was scared and shocked but able to breathe. Defendant released her quickly and she yelled for help at which point he hit her in the face.

C.R. was on the floor and defendant was on top of her keeping her down. The couple's teenage son woke up and saw defendant on top of C.R. The son told responding officers he saw his dad's arm around his mom's neck and defendant struck C.R. with knee strikes to her ribs three times. Both C.R. and defendant told their son to call 911.

According to C.R., when the police arrived, they "knocked the door open." She testified defendant had already released her and was about to open the door when the

4

police barged in.  On this point, the responding officers testified, "I believe that Officer Sanders stated that he could hear a verbal argument, and then he peered through the window that was adjacent to the front door and looked in and stated that the fight was still—that it was still physical, and that's when we made entrance into the residence based off of exigent circumstances."  The officers called defendant outside and detained him in handcuffs.

C.R. had a bruise on her neck, some soreness in her jaw, and swelling above her eye on her temple.

Defendant brought a motion for mental health diversion under section 1001.36 in the felony case.  In that motion, defendant asserted he had been diagnosed with mental disorders and those mental disorders were a significant factor in the commission of the charged offense.  In support of his motion, defendant submitted Dr. Jakubowski's January 2024 evaluation.  Once again, Dr. Jakubowski diagnosed defendant with the same mental health disorders as she had in October 2023.  She added the diagnosis of mild neurocognitive disorder.

During this evaluation, defendant told Dr. Jakubowski C.R. was upset with him so, he left the house.  When he finally returned, C.R. was confrontational about wanting to know where he had been.  He believed his suspicions and paranoia of her attempting to having him killed were at the forefront of his mind.  Defendant saw his wife doing something on her phone and that caused him to go into an episode.  He reported he genuinely believed his wife was attempting to harm him.

Dr. Jakubowski again concluded defendant's mental health disorders played a significant role in the commission of the offenses charged.  She also repeated her prior conclusion defendant was in the low range for the risk of recidivism.

The People opposed the request for diversion.  On the subject of his suitability for diversion, the People argued defendant posed an unreasonable risk of danger to public safety if treated in the community.

5

During the joint preliminary hearing and diversion hearing, Dr. Jakubowski confirmed the diagnoses in her report. She testified she did not believe defendant would be an unreasonable risk of danger to public safety if he were treated in the community. She based this opinion on the results of the standardized test she administered to defendant in October 2023. Dr. Jakubowski testified defendant's score on that test was on the low range on the spectrum of recidivism and concern. Dr. Jakubowski also stated she did not re-administer the standardized test in January because that second evaluation was within six months of the first. When asked how she reconciled defendant's low score on the test with the fact defendant committed a second assault within four months, Dr. Jakubowski responded because defendant had not received treatment at the time of the second assault and he "behaved in maladaptive behaviors."

The trial court found defendant met the eligibility requirements for mental health diversion. The trial court, however, found he was not suitable, writing: "The court has weighed all the evidence and information presented by the parties in assessing whether there is an unreasonable risk that defendant might commit a violent felony with[in] the meaning of . . . section 667[, subdivision] (e)(2)(C)(iv) if treated in the community. Of importance to the court's analysis is the fact that following a stipulation to mental health diversion in [the misdemeanor case], a case where defendant is alleged to have committed crimes of false imprisonment and battery against his spouse, and while that case was pending, defendant is alleged to have reoffended and committed additional crimes against his spouse, of a much more serious and dangerous nature. The court in this case remains concerned that if treated in the community, defendant would be a danger to others, most specifically his spouse, based on continuing beliefs regarding [his wife's] unfaithfulness and desire to harm or kill him. The court notes defendant is alleged to have committed the identified offenses in the presence of his minor children, continuing to hold her against her will, using his strength and size advantages to hold her neck and her body down, and only relenting when law enforcement broke down the door

6

of his home.  [¶]  Based on the facts of this case, the court concludes there is an unreasonable risk to public safety, and particularly to [his wife], within the meaning of . . . section 1170.18, if defendant was treated in the community."  On the record, the trial court added, "This is the second case in which similar allegations have been made.  The incident occurred in front of the defendant's children.  It stopped when law enforcement arrived which, by all accounts occurred very quickly [when] they broke down the door.  [¶]  The defendant, having granted mental-health diversion in the earlier case when these events occurred, the behavior in this case indicates escalation and increasing dangerousness so, in this matter, the [c]ourt finds the defendant would pose an unreasonable risk to public safety, particularly to his spouse, if treated in a community and that is the reason why the mental-health diversion was denied."

In the felony case, defendant pled no contest to inflicting corporal injury on his spouse.  In the misdemeanor case, he pled no contest to battery against his spouse.  Pursuant to a joint plea agreement, the trial court granted defendant formal probation for four years.  After three years of successful completion of probation, his sentence would be converted to informal probation.  After successful completion of mental health court, the court may reduce his felony to a misdemeanor and grant motions under sections 1203.3 and 1203.4.

Defendant filed a timely notice of appeal and obtained a certificate of probable cause.

## II.  DISCUSSION

Defendant argues substantial evidence does not support the trial court's finding defendant posed an unreasonable risk to public safety.  We disagree.[3]

---

[3] To the extent defendant challenges the revocation of his mental health diversion in the misdemeanor case, defendant remained in custody in the current case until he pled no contest in both cases.  Termination of the misdemeanor diversion was part of the

7

"[S]ection 1001.36, subdivision (b) provides that a defendant is eligible for pretrial diversion if two criteria are met. First, the defendant has been diagnosed with a mental disorder, such as the one with which defendant was diagnosed, within the last five years by a qualified mental health expert. [Citation.] Second, the 'defendant's mental disorder was a significant factor in the commission of the charged offense.' [Citation.] 'If the defendant has been diagnosed with a mental disorder, the court shall find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense.' " (*People v. Graham* (2024) 102 Cal.App.5th 787, 795.)

"If a defendant meets these eligibility requirements, the court also must find that the defendant is suitable for pretrial diversion based on satisfaction of the following criteria: '(1) In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment. [¶] (2) The defendant consents to diversion and waives the defendant's right to a speedy trial . . . . [¶] (3) The defendant agrees to comply with treatment as a condition of diversion . . . . [¶] [and] (4) The defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community.' " (*People v. Graham, supra*, 102 Cal.App.5th at p. 795.)

Only the last of these criteria is at issue here. An "unreasonable risk of danger" to public safety means " 'an unreasonable risk that the petitioner will commit a new violent felony' within the meaning of section 667, subdivision (e)(2)(C)(iv)." (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1149 (*Whitmill*).) Under the statute, the new violent felonies that may be relevant here are any homicide offense, including attempted homicide. (§§ 1001.36, subd. (b)(1)(F), 1170.18, subd. (c), 667, subd. (e)(2)(C)(iv); see

stipulated agreement and thus is not before us in this appeal of these joint cases under section 1471.

8

also *People v. Moine* (2021) 62 Cal.App.5th 440, 449 (*Moine*).) In making this decision, the trial court "may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).)

We review a trial court's ruling on a motion for pretrial mental health diversion for abuse of discretion. (*People v. Graham, supra,* 102 Cal.App.5th at p. 795.) "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence [citation]." (*Moine, supra*, 62 Cal.App.5th at p. 449.)

Defendant cites *Moine* and *Whitmill* where the appellate courts concluded the trial courts abused their discretion in finding those defendants posed an unreasonable risk to public safety. (*Moine, supra*, 62 Cal.App.5th at p. 451; *Whitmill, supra*, 86 Cal.App.5th at p. 1150.) He argues his criminal history is more limited, the facts here are much less serious, and the psychologist supports his diversion.

In *Moine*, the defendant had no prior violent record but got into a fistfight with another patient at an urgent care facility and a year later made a verbal threat to shoot an urgent care worker. (*Moine, supra*, 62 Cal.App.5th at pp. 444-445.) After defendant threatened the worker, he immediately and profusely apologized. (*Ibid.*) Two psychiatrists concluded he posed a low risk for future assault. (*Id.* at p. 446.) In fact, defendant had been released upon bond prior to trial, in part based on the trial court's finding he was not likely to cause great bodily harm to others if released. (*Id.* at p. 451.) The appellate court concluded these facts did "not support the trial court's implied finding that [the defendant] was likely to commit a super strike offense if he received mental health treatment in the community." (*Ibid.*)

9

In *Whitmill*, the 61-year-old defendant, who also had no prior violent record, negligently fired a single shot into the air. (*Whitmill, supra*, 86 Cal.App.5th at pp. 1142, 1151.) The defendant then threw away his weapon and ran away from any further confrontation. (*Id.* at pp. 1143, 1151.) He peacefully came forward at law enforcement's request to be arrested. (*Id.* at p. 1151.) Like the defendant in *Moine*, his psychologist concluded the defendant would not pose an unreasonable risk of danger to public safety if he were treated in the community. (*Id.* at p. 1145.) The *Whitmill* court concluded defendant's "compliant nonviolent behavior after negligently firing one shot into the air mitigates any inference that appellant is likely to commit a super-strike offense in the future." (*Id.* at p. 1154.)

While these cases provide us with guidance, "[w]hen we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) Indeed, defendant's two assaults on C.R. here do not demonstrate a single episode of negligent violence coupled by an immediate retreat and cooperation with law enforcement as reflected in *Whitmill, supra*, 86 Cal.App.5th at pages 1142-1143, 1151. Similarly, these two assaults are not the equivalent of the threat accompanied by an immediate and profuse apology reflected in *Moine, supra*, 62 Cal.App.5th at pages 444-445, 450-451.

Here, defendant engaged in physical abuse of C.R. in September 2023. Defendant attempts to minimize this incident, but the trial court saw C.R. and heard her testimony as to what happened that day and was entitled to credit her original report that defendant pinned her and discredit her later disavowal of this report.

Despite the psychologist's October 2023 prediction defendant was not likely to reoffend if treated in the community, three months later defendant escalated his violence towards C.R., again based on apparent delusions of her infidelity. Without provocation, he grabbed her by the neck, hit or punched her in the face, and held her on the ground

10

while kneeing her in the side multiple times. Moreover, both incidents happened at home behind closed doors. The most recent occurred while defendant's and C.R.'s children were sleeping nearby. Defendant's abuse of his wife increased both in frequency and severity in those four months. It is precisely the increasing frequency and severity of this domestic violence that underlies the trial court's finding defendant posed an unreasonable risk of committing a super strike, such as attempted murder or murder.

The trial court's analysis finds support in the legislative history underlying the enactment of the Evidence Code provision that allows for the admission of prior acts of domestic violence. "[T]he legislative history of the statute recognizes the special nature of domestic violence crime, as follows: 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner. Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all.' " (*People v. Johnson* (2000) 77 Cal.App.4th 410, 419.)

The trial court did not abuse its discretion in discounting the psychologist's opinion defendant had a low risk of reoffending. The second incident happened while defendant had been enrolled in a mental health treatment program in the community on the strength of this same psychologist's opinion defendant had a low risk of reoffending. "Although experts may testify about their opinions, the fact finder decides what weight to give those opinions." (*In re Scott* (2003) 29 Cal.4th 783, 823.) The trial court did not

abuse its discretion in rejecting Dr. Jakubowski's conclusion defendant was not likely to reoffend especially given that the second incident occurred a mere three months after this earlier prediction defendant was a low risk for reoffending.

Both parties asked us to consider evidence not presented to the trial court at the time it denied defendant's motion for diversion. Defendant asks us to consider the plea agreement that granted him probation and mental health treatment out of custody that was approved by two judicial officers. The People ask us to examine the facts underlying the misdemeanor case contained in the probation report filed with the trial court after the May 2024 hearing on the diversion motion. These facts include allegations that defendant answered the door to his home wearing body armor armed with three weapons.

Our review, however, is limited to the evidence before the trial court at the time the challenged decision was made. (*People v. Hartsch* (2010) 49 Cal.4th 472, 491.) Moreover, having already concluded the trial court did not abuse its discretion in finding defendant presented an unreasonable risk of committing a super strike, the fact that different judges of the trial court later approved his plea deal providing for probation and participation in post-plea mental health court after denying his request for pretrial diversion is not a reason for this court to supplant the trial court's determination. (See, e.g., *People v. Brown* (2024) 101 Cal.App.5th 113, 123-124 [existence of some evidence in record supporting a contrary dangerousness inference is an insufficient basis to overturn that finding].)

12

## III.  DISPOSITION

The judgment is affirmed.

/S/

RENNER, J.

We concur:

/S/

EARL, P. J.

/S/

FEINBERG, J.